UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JARED A. BAKER, ET AL.,

      Plaintiffs,

                                                                                    Case No. 13-13279

v.

                                                                                     Paul D. Borman

SHERIFF ANTHONY WICKERSHAM          United States District Judge

      Defendant,
_____/

OPINION AND ORDER
REGARDING DEFENDANT WICKERSHAM'S MOTIONS IN LIMINE
(ECF NOS. 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, & 105)

Now before the Court are Defendant Sheriff Anthony Wickersham's Motions *in Limine* (ECF Nos. 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, and 105). A hearing on all these motions *in limine* was held on June 7, 2016.

I. BACKGROUND

On July 31, 2013, Plaintiffs filed a complaint against Macomb County and the current Macomb County Sheriff, Anthony Wickersham, in his official and individual capacity, alleging violations of Plaintiffs' rights of freedom of speech and association under both the Federal and Michigan Constitutions. (ECF No. 1.) On March 14, 2014, Plaintiffs filed an amended complaint that named Captain John Roberts as a defendant, and alleged that he also participated in the alleged retaliation against Plaintiffs. In short, Plaintiffs allege in their amended complaint that Defendants Sheriff Anthony Wickersham, Captain John Roberts, and the County of Macomb violated their federal and state constitutional rights by retaliating against them in response to their political activities and affiliation.

Plaintiffs are currently employed as deputy sheriffs at the Macomb County Sheriff's Office.  In 2012, Plaintiffs openly supported and campaigned for Greg Stone, a candidate challenging the Defendant Wickersham in the 2012 Democratic primary election for sheriff of Macomb County.  Following Greg Stone's loss in the 2012 primary election, Defendant Wickersham was elected Sheriff of Macomb County in November 2012.  Plaintiffs allege that following his election, Defendant Wickersham placed them in less favorable job positions in retaliation for their political support of his opponent: Plaintiffs were transferred from substation assignments into the general pool (a position also referred to as "common field deputy").

After discovery, Plaintiffs and Defendants filed cross motions for summary judgment.  On September 28, 2015, the Court issued an Opinion and Order that denied Plaintiffs' partial motion for summary judgment and granted in part and denied in part Defendants' Motion for Summary Judgment.  (ECF No. 92.)  Pursuant to that Opinion and Order, Defendants Roberts and the County of Macomb were dismissed as defendants.  The Court also granted Defendants' motion for summary judgment as to the 42 U.S.C. § 1983 claims asserted against Defendant Wickersham in his official capacity but denied summary judgment on the 42 U.S.C. § 1983 claims asserted against Defendant Wickersham in his individual capacity.  Finally, the September 28, 2015 Opinion and Order denied in part and granted in part Defendants' motion for summary judgment as to Plaintiffs' Michigan constitutional claims such that only Plaintiffs' claims for injunctive and declaratory relief pursuant to the Michigan Constitution remain against Defendant Wickersham.  (ECF No. 92, at 45.)

## II. STANDARD OF REVIEW

"The Federal Rules of Evidence, the Federal Rules of Criminal and Civil Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures – including motions *in limine* – in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999); *Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013) ("A motion in limine is any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." (internal quotation marks omitted)). "Motions *in limine* typically involve matters which ought to be excluded from the jury's consideration due to some possibility of prejudice or as a result of previous rulings by the Court." *Provident Life & Acc. Ins. Co. v. Adie*, 176 F.R.D. 246, 250 (E.D. Mich. Sept. 27, 1997) (Gadola, J.). District courts have broad discretion over matters involving the admissibility of evidence at trial. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir. 1991). "In *in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n. 3 (2000) (citing *Luce v. United States*, 469 U.S. 38, 41-42 (1984)).

## III. ANALYSIS

A.     Motion *in limine* Regarding Evidence Related to Non-Party Employees (ECF No. 101)

Defendant seeks to preclude Plaintiffs from introducing evidence relating to "non-party employee performance." (ECF No. 101.) Defendant argues that any evidence regarding a non-party employee's performance is not relevant and not admissible under FED. R. EVID. 402. In the

3

alternative, Defendant contends that even if the Court were to find evidence of a non-party employee's performance relevant the Court should still preclude the evidence under FED. R. EVID. 403 because the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to Defendant.

Defendant notes that during discovery Plaintiffs sought information regarding the performance of several non-party employees: Deputy Adam Donofrio, Anthony Allegrina, Deputy Jeffrey Keko, Sergeant John Rollo, Deputy Terae Young.  Defendant theorizes that Plaintiffs will likely elicit testimony regarding the poor performance and/or discipline of these non-party employees for the purposes of evidencing that they were poor employees that were improperly placed in substation positions.  Specifically, Deputy Donofrio's involvement in the 2013 traffic stop of an armed robbery suspect (Bondy Dep. at 51); Deputy Allegrina's alleged discipline in 2013 after an investigation into an ABC Warehouse matter (Wickersham Dep. at 201); Deputy Young's discipline in 2013 for stashing evidence in a locker (*Id.*); Deputy Keko's write up after failing to seize a car during an arrest (*Id.* at 170-72); and Sergeant Rollo's 14-day suspension in 2012 after a drunk driving accident (*Id.* at 102-03).

Defendant argues that evidence of these non-party employees' discipline or poor performance will not make it more or less probable that Defendant Wickersham retaliated against Plaintiffs for their political participation.  Specifically, Defendant argues that these examples of poor performance by Donofrio, Allegrina, Keko, and Young all occurred *after* their 2013 placement into the substation positions, and therefore Defendant Wickersham could not have known of these (future) incidents at the time of the assignments.  Defendant also asserts that some of the non-party employees did not support Defendant Wickersham in the primary race

4

for sheriff of Macomb County. Defendant further argues that Sergeant Rollo's discipline is not relevant because he did not receive a substation assignment in 2013: Sergeant Rollo was assigned to the position of Court Services Command Officer. (Def.'s Reply, Ex. B, 2013 Assignments.)

Rule 401 sets forth that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401. Relevant evidence is generally admissible. FED. R. EVID. 402. Yet, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or the needless presentation of cumulative evidence. FED. R. EVID. 403.

The Court finds that Defendant Wickersham's request is over broad because he seeks to preclude all evidence of the performance of non-parties with no support for the preclusion of such a general category of evidence. "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). Accordingly, the Court construes Defendant's motion as a request to preclude evidence of the discipline or poor performance of Officers Donofrio, Keko, Young, and Allegrina in 2013 and the suspension of Officer Rollo in 2012.

The Court also finds that Defendant's argument regarding the relevance of Donofrio, Allegrina, Keko, and Young's disciplines and/or poor performance is unpersuasive. The standard for relevance under Rule 401 is "extremely liberal." *Dortch v. Fowler*, 588 F.3d 396,

5

400 (6th Cir. 2009). Thus, evidence is considered "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence." *Id.* (quoting FED. R. EVID. 401). Plaintiffs carry the burden to establish a causal link between their protected activity and the adverse action or actions that they suffered. In the instant case, there is evidence that Defendant selected these "non-parties," who were not recommended by their supervisors, for substation positions over Plaintiffs, who were recommended by their supervisors. Plaintiffs also aver that Defendant refused to remove those officers from the substations after becoming aware of their performance issues, rather reassign Plaintiffs to those positions. The Court concludes that this evidence of poor performance could support Plaintiffs' argument that Defendant's motivation in the making the assignments was retaliation rather than a legitimate reason. *See Philbrick v. Holder,* 583 F. App'x 478, 487 (6th Cir. 2014) (noting in the context of a gender discrimination claim that "evidence of irregularities in the application and selection process and inconsistencies in the reasons given by [the employer] for not hiring [plaintiff], along with evidence of her allegedly superior qualifications, which, if believed by the trier of fact, could lead to the conclusion that plaintiff was discriminated against, is sufficient to raise a genuine issue of material fact concerning pretext." (citation and internal quotation marks omitted)).

While Defendant argues that his reason for placing these above-listed officers in substation positions was to give inexperienced officers a chance to gain experience, and thus performance was not the controlling factor in the decision-making process, that argument goes to the weight of the evidence and not its admissibility. A district court is not "permitted to consider the weight or sufficiency of the evidence in determining relevancy and '[e]ven if a district court

believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has even the slightest probative worth.'" *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998) (quoting *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992)). Accordingly, Defendant's argument is one for the jury and cannot be used to bar Plaintiffs from supporting their own theory during trial.

Defendant is correct that later specific instances of poor performance by Donofrio, Keko, Young and Allegrina in 2013 is not relevant as to Defendant's knowledge in 2012 regarding their performance. Thus, any testimony evidencing that Donofrio, Keko, Young and Allegrina were generally known as poor performers prior to 2013 could be relevant. The specific incidents of discipline or of poor performance of the above-listed individuals in 2013 is not relevant to Plaintiffs' claims that they were denied placement in substation positions.

Defendant also argues that this evidence is not relevant because non-party Young donated to the Stone campaign. In other words, Defendant contends that the fact that Young was a Stone supporter undermines Plaintiffs' argument that his transfer is relevant. However, Plaintiffs all openly and actively supported the Stone campaign in a visible manner and it is unknown whether Young participated in a similar way or whether Defendant was even aware of his political activities. Again this argument is one that goes towards the weight of the evidence rather than its relevance or admissibility.

The Court also rejects Defendant's alternative argument that evidence of Donofrio, Keko, Young, and Allegrina's poor performance should be precluded as more prejudicial than probative under Rule 403. Rather than demonstrating that the probative value of this evidence is substantially outweighed by the danger of *unfair* prejudice, Defendant merely seeks to exclude

the evidence because it is prejudicial to his theory of the case. To wit: Defendant summarizes his position as: "to bring in evidence of performance issues regarding Donofrio, Allegrina, Keko, and Yong, then characterize them as 'poor performers' relative to Plaintiffs, would only serve to confuse the jury and be highly damaging to Defendant because the jury would make the inference that Defendant improperly ignored supervisor recommendations and selected inferior deputies for substation assignments as a form of retaliation against Plaintiffs." (Def.'s Reply at 6.) This is, in fact, Plaintiffs' theory of the case. Defendant continues his argument by asserting: "[i]n reality, Defendant was the sole decision-maker, believed that all deputies should be rotated through the substations to give everyone experience, and any assertion that certain deputies were inferior is based on speculation." (*Id.*) This is Defendant's theory of the case. "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (internal quotes and citations omitted). Defendant appears to object to the evidence because it might persuade the jury that Defendant did in fact retaliate against Plaintiffs. Defendant has failed to show that such an inference would be improper and his argument fails.

To the extent that Defendant seeks to preclude evidence regarding Sergeant Rollo's suspension, the Court finds that this evidence does not have any relevance to whether Plaintiffs were replaced with unqualified, poor performers who were not recommended by superiors because Sergeant Rollo was not assigned to a substation in 2013. Plaintiffs also failed to specifically address the relevance of Sergeant Rollo's performance in their briefing or at the hearing. Given these facts, the Court concludes that any evidence regarding Sergeant Rollo's suspension is not relevant to any issue in this case and that it must be precluded under 401 and

402 as not relevant.

In summary, the Court will deny in part and grant in part Defendant's Motion *in limine* regarding non-party witnesses.

B.     Motion *in limine* to Exclude Greg Stone as a Witness (ECF No. 103)

Defendant seeks to exclude Greg Stone as a Plaintiff witness in this case. As noted *supra*, Greg Stone unsuccessfully ran against Defendant in the 2012 primary election for Sheriff of Macomb County. Defendant argues that Stone has no knowledge of any possible retaliation because he did not work at the Sheriff's Office at that pertinent time. Defendant concludes that because Stone has no knowledge of any alleged retaliation and because there is no dispute that Plaintiffs supported Stone in the primary; Stone's testimony would not make it any more or less probable that Plaintiffs suffered retaliation and all of his testimony should be barred as irrelevant and thus inadmissible under FED. R. EVID. 401 and 402. Defendant also argues that any probative value of Stone's favorable personal opinion of Plaintiffs would be substantially outweighed by the danger of unfair prejudice to Defendant because the jury might believe Stone's "personal opinion of Plaintiffs is evidence of the type of deputies they are and assume that Sheriff Wickersham must have been retaliating against them by removing them from substations." (ECF No. 103, at 4.)

The Court finds that it would not be unfairly prejudicial, confusing, or cumulative to have Stone testify regarding his knowledge of Plaintiffs' actions in support of his campaign – what they did, but not what they said or what was said in flyers or signs that they passed out or put on their private vehicles or homes. Indeed, Stone's testimony on the subject of Plaintiffs' political actions is relevant as those political activities are an element of Plaintiffs' prima facie case.

Indeed, Defendant admitted the relevance of this testimony at the hearing.

Further, the Court finds that the probative value of Stone's testimony on the issue of Plaintiffs' political actions (not what they said other than "Elect Stone") is not substantially outweighed by the danger of jury confusion or the possibility of presenting needlessly cumulative evidence. FED. R. EVID. 403.

For all these reasons, Defendant's Motion *in Limine* to Exclude Greg Stone as a Witness is denied. (ECF No. 103.)

C.     Motion *in Limine* Regarding the "No Fly List" (ECF No. 99)

Defendant argues that Plaintiffs should be precluded from introducing evidence regarding the "no fly list" because it is irrelevant under FED. R. EVID. 401 and 402, and even if it is relevant evidence, the risk of prejudice, undue delay and confusion to the jury substantially outweighs the probative value of the term and it should be precluded under FED. R. EVID. 403.

This Court previously summarized the Defendant's actions prior to the 2012 assignment meeting in its Opinion and Order resolving the Motions for Summary Judgment. That background is incorporated and repeated here:

> Defendant Wickersham testified that after being elected he wanted to reorganize the Sheriff's Department, specifically he "wanted to give people with less seniority an opportunity to work" and also believed that all deputies should work the road regardless of their preference. (Wickersham Dep. at 127-28). Defendant Wickersham did not discuss his new reorganization plan with anyone prior to the assignment meeting in November 2012. (*Id*. at 132).
>
> To effect his reorganization, Defendant Wickersham made a handwritten list of deputy names that reflected the deputies that he wanted moved out of the substations to make room for less experienced officers. (*Id*. at 124-29). There is no dispute that all four of Plaintiffs' names were on the handwritten list. (Ex. M, Roberts Dep. at 84-85). Defendant Wickersham handed his list to Defendant Roberts before the assignment meeting took place. (*Id*. at 125; Roberts Dep. at 30-31). Defendant Roberts had been part of the assignment meetings since 2001

10

> but this was the first time he was given such a list. (Roberts Dep. at 12, 31, 40). Defendant Wickersham did not tell Defendant Roberts why he had created the list or discuss it with him, rather, Defendant Wickersham only told Defendant Roberts "[t]hese are the individuals that I want moved out of substations." (Wickersham Dep. at 125:7-8; Roberts Dep. at 30-31, 34). Defendant Wickersham did not advise Defendant Roberts that deputies with less experience should fill the substations openings. (Wickersham Dep. at 128).
>
> A copy of the list that Defendant Wickersham created no longer exists. However, during the assignment meeting, Defendant Roberts kept notes on an assignment sheet. (Ex. J; Roberts Dep. at 79). These notes include hash marks next to certain deputies' names. (*Id*.). Defendant Roberts testified that most of these hash marks corresponded to the names on Defendant Wickersham's list. (*Id*. at 79-80). Thereafter, Defendant Roberts clarified that the marks next to Deputies Quartuccio and Yunker did not refer to the Sheriff's list. (*Id*.). Defendant Wickersham confirmed during his deposition that the deputies' names that were hash marked, except Deputies Quartuccio or Yunker, may have been on his list and were all Stone supporters.[] (Wickersham Dep. at 134-35).
>
> ...
>
> Captain Baker similarly testified that during the [assignment] meeting she discovered that the Plaintiffs could not be assigned to a substation per Defendant Roberts. (B. Baker Dep. at 101). She was never given a reason why these particular deputies were not allowed a substation. (*Id*. at 102). At the conclusion of the meeting, Plaintiffs had all been assigned to the general pool.
>
> Sergeant Willis testified that he was surprised when the assignment list became public because while it was common for one or two recommendations to be ignored, ignoring four recommendations was unusual, stating: "there's always one or two ... but never our top guys." (Willis Dep. at 32).

(ECF No. 92, Opinion and Order, at *7-8 (footnote omitted).)

After the assignment list was released in late December 2012 or early January 2013, Sergeant David Willis testified that he became aware "who was going where" and spoke with other command officers and "that's where it started from. I had called it a 'no fly list.'" (Def.'s Br., Ex. E, Willis Dep. at 15.) Sergeant Willis testified that:

> well, between that first job assignment and when the second suggestion for job assignments went in for other substations – that was the second email, the one

11

> that I had produced – between there, we were told – or Lieutenant Kozlowski told me there were three deputies on our shift that were not going to be getting substation assignments, and that was per the corner. And then I don't know what was going on. I just coined it they're no fliers. They don't get to have a substation.

(*Id*. at 15-16.) Willis also clarified that:

> A.  [Lieutenant Kozlowski] was told by Brenda Baker that these guys have nothing coming.
>
> Q.  Okay.
>
> A.  And from that, it was me – I don't know why I coined it or why I said it. It was me that said, "Well, then they're on the 'no fly list,'" then.
>
> Q.  Okay. It emanated from Brenda Baker. Kozlowski passed along, and then you coined the "no fly list" concept?
>
> A.  Correct.

(*Id*. at 60.) Willis further testified that after the 2013 assignment list came out, Plaintiffs asked him why they were not assigned to substation positions and Willis told them that it was because "you guys supported Stone. That's what I am hearing." (*Id*. at 32.) Willis also testified that his personal experience over 25 years with the station led him to the conclusion that Plaintiffs were denied a substation assignment because of they supported Greg Stone in the primary election. (*Id*. at 18-19.)

Captain Brenda Baker confirmed that after the 2012 assignment meeting during late 2012 or early 2013, she informed Lieutenant Kozlowski that the Plaintiffs were not allowed to have permanent substation assignments. (Def.'s Reply, Ex. F, B. Baker Dep. at 73.) Captain Baker explained that Captain Roberts had advised her this fact but she was never told the reason why Plaintiffs could not have those positions. (*Id*. at 74.)

Other individuals offered limited testimony in their depositions regarding the term "no fly list." Plaintiff Burbeula testified that Sergeant Willis created the term "no fly list" and that it meant that "we were not going to get a spot at all." (ECF No. 99, Def.'s Br., Ex. C, Burbeula Dep. at 46.) Plaintiff Tabor testified that he did not know who coined the phrase, nor when he first heard the phrase but he believed it to mean "a list of people that can't get preferred assignments from substations because they supported Greg Stone in the Democratic primary, 2012." (Def.'s Br., Ex D, Tabor Dep. at 82-83.) Plaintiff Likens testified that he was told by Kozlowski that another deputy (Raymond Langley) was on the same "no fly list" because he had filed a racial discrimination case against the county.[1] Sergeant Stacy O'Brien testified that he overheard the term "no fly list" being used at the station and it was "a term that somebody coined, referring to the belief that there's individuals that are on a list that are not to be assigned substations." (Def.'s Br., Ex. F, at 52-53.) Sergeant O'Brien could not remember who was using the term and paid little attention to the overheard conversation because "it was again more rumor-based conversation." (*Id*. at 53.) Captain Roberts testified that he was unfamiliar with the meaning of the term. (Def.'s Br., Ex. G, Roberts Dep. at 51-52.)

There are three different "lists" that are referred to throughout both parties' briefs on this matter. The first list, was the list that Defendant actually authored and handed to Captain Roberts that contained the names of Plaintiffs and other deputies whom he wanted remove from substation assignments. This list no longer physically exists. The second list, was a list created by Captain Roberts during the 2012 assignment meeting. This second list was created by

---

[1] Raymond Langley filed a separate discrimination action against Defendant and the County of Macomb which is the subject of a separate motion *in limine*, ECF No. 96.

Captain Roberts by annotating a printed form with hash marks next to certain deputies names. The vast majority of these marks corresponded to the names that had been on Defendant's aforementioned list (and indisputably included Plaintiffs' names). The third "list," the "no fly list," was never a physical list, but was a catchphrase created by Sergeant Willis to describe to Plaintiffs his belief that they had been denied substation assignments due to their political involvement.

As noted previously, Rule 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401. Relevant evidence is generally admissible. FED. R. EVID. 402.

Here, the "no fly list" term was coined by Sergeant Willis who had no first-hand personal knowledge regarding either the 2012 assignment meeting or Defendant's creation of the assignment list. Rather, Sergeant Willis created the term "no fly list" as a short-hand way to describe his beliefs regarding Plaintiffs' non-assignments but admitted that he did not know why he came up with the term. Given these facts, especially the fact that Sergeant Willis was not the decisionmaker or even privy to the assignment meeting, the Court concludes that the phrase "no fly list" is not relevant to establishing that any adverse action occurred, or relevant to establishing a connection between Plaintiffs' protected conduct and the adverse action. While Sergeant Willis' beliefs and his perceptions may be relevant and pertinent to these issues, his phrase "no fly list" or "no fliers" are merely descriptive phrases created by a non-decisionmaker, and have no relevance to the issue of Defendant's action of reassigning Plaintiffs from substation positions.

D.      Motion *in Limine* Regarding "Retribution Wednesday" (ECF No. 98)

Defendant similarly requests that the Court preclude Plaintiffs from introducing any evidence regarding the phrase "Retribution Wednesday" during the trial because it is irrelevant and inadmissible under Rules 401 and 402, or even if relevant, its probative value is substantially outweighed by the danger of unfair prejudice to Defendant pursuant to Rule 403.  Additionally, Defendant contends that any witness who would testify regarding the term would lack the personal knowledge to testify as to its applicability to the present action as required by Rule 602.

Sergeant Willis, who testified regarding the term "no fly list," also referenced the term "Retribution Wednesday," stating:

> Q.   Okay.  And what thought crossed your mind at the that time as to the reason for [the denial of substation positions]?
>
> A.   It was because they supported Greg Stone in the election.
>
> Q.   And did that come to mind right away for you?
>
> A.   Absolutely.
>
> Q.   Why?
>
> A.   Because it was of a common practice at the sheriff's office.  They call it "Retribution Wednesday" for a reason.
>
> Q.   Okay.  And when did you first hear the term "Retribution Wednesday"?
>
> A.   Two years prior, when I was going to run for sheriff, and the chief warrant officer at the county building told me, "Let me remind you, Dave, about Retribution Wednesday.  It's coming for you."
>
> Q.   Wednesday being the day after the Tuesday election?
>
> A.   That is correct.  <u>And that was by Dean Alan at the prosecutor's office. That's where I had first heard that</u>.
>
> Q.   Okay.  And so when you were told that, you – obviously the message

>    sounds like, came through to you, there will be ramifications of a negative nature if I challenge by running.
>
> A. There always is.
>
> Q. Okay. And when you say "there always is," what are you referring to?
>
> A. Previous people who have backed the wrong candidates, previous people who have tried running for sheriff.
>
> ....
>
> Q. But you were being told there will be – at least on the Retribution Wednesday comment – there would be retribution?
>
> A. Yes.
>
> Q. And then you had observed that yourself over time?
>
> A. Over 25 years at the sheriff's office, I have.

(Willis Dep. at 17-19 (emphasis added).)

Several other individuals were also interviewed regarding their knowledge of the term "Retribution Wednesday." Sergeant Bondy testified that he heard the term from "somebody in the prosecutor's office discussing unrelated to our office, but it's typically when whoever wins comes in and cleans house, or at least exacts whatever revenge they're going to have on the disloyal." (ECF No. 98, Def.'s Br., Ex. B, Bondy Dep. at 22.) Similarly, Lieutenant David Kennedy testified that he had also heard the term used years prior by a prosecuting attorney in the warrant division. (ECF No. 98, Def.'s Br., Ex. C, Kennedy Dep. at 73-74.) Both Defendant and Captain Roberts testified they were unfamiliar with the term. Dean Alan, the prosecutor cited by Sergeant Willis, as to where Willis had heard the phrase, provided through declaration that he had used the term "Retribution Wednesday" for over 30 years, but had never used it in reference to the Macomb County Sheriff's Office and was unaware of any political retaliation in

the Sheriff's Office. (ECF No. 98, Def.'s Br., Ex. D, Alan Decl. ¶ 13.)

In its initial brief, Defendant primarily argues that any evidence regarding "Retribution Wednesday" is not relevant and thus inadmissable because the term is only associated with the Macomb County Prosecutor's Office and there is no evidence that "Retribution Wednesday" ever occurred at the Sheriff's Office. (ECF No. 98, Def.'s Br., at 4-5, "In other words, there is no evidence that anyone in the Prosecutor's Office, let alone the Sheriff's Office, suffered any consequences for being 'disloyal.'"). Defendant's relevance argument ignores Sergeant Willis' testimony regarding the term. To wit, Sergeant Willis testified that he concluded that the act of denying Plaintiffs the substation assignments was a result of political retaliation based on his personal experience with such retaliation over his 25 years working in the Sheriff's Office. Sergeant Willis testified that such an event was called "'Retribution Wednesday' for a reason." (Willis Dep. at 17.)

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and relevant evidence is generally admissible. FED. R. EVID. 401, 402. In the instant action, Plaintiffs' superior, Sergeant Willis, concluded based on his experience with the Sheriff's Office, that the denial of substation assignments was retribution due to Plaintiffs' political activities. While Willis' factual testimony regarding retaliation is relevant to this First Amendment retaliation case, testimony using his descriptive phrase "Retribution Wednesday," is not.

The Court further finds that the term's probative value is outweighed by the risk of unfair prejudice to Defendant. "Unfair prejudice" means "the *undue* tendency to suggest a decision based on improper considerations; it 'does not mean the damage to a defendant's case that

17

results from the legitimate probative force of the evidence.'" *Claiborne Cnty.*, 103 F.3d at 515 (emphasis in original) (quoting *Bonds*, 12 F.3d at 567). Significantly, the term "Retribution Wednesday" was created by an Assistant Prosecutor describing conduct at the Macomb County prosecutor's office to Sergeant Willis. Sergeant Willis picked it up and "ran with it" to describe his view of the Sheriff's office. Sergeant Willis' descriptive phrase is not relevant evidence. Further, it would be improper to suggest to a jury that there is a tradition of retaliation in Macomb County and Defendant retaliated against Plaintiffs because of this tradition. Thus, the phrase must be precluded from trial.

The Court notes, however, this holding applies only to the phrase "Retribution Wednesday" and not to Sergeant Willis' testimony or conclusions generally, to the extent that a proper foundation is laid. The phrase "Retribution Wednesday" is precluded from introduction at trial.

E.       Defendant's Motions *in Limine* (ECF Nos. 94, 95, 96, 97, 100, 102, 104 & 105)

Plaintiffs filed a single response addressing the remaining eight motions *in limine* filed by Defendant. These motions address the Al-Shara case (ECF No. 94), the General Holiefield case (ECF No. 95), any evidence relating the *Barnes* and *Langley* lawsuits (ECF No. 96), any matters regarding race within the Macomb County Sheriff's Office (ECF No. 97), evidence regarding "Special Counsel" (ECF No. 100); evidence regarding Defendant's interaction with Harvest Homes LLC (ECF No. 102); Lieutenant Daniels' discipline (ECF No. 104), and the 2008 Promotional Exam (ECF No. 105).

Plaintiffs represent that they offered to stipulate not to refer to the evidence at issue in their opening statement or by eliciting it in their case and "reserve the right to raise the issues

18

with prior notice to all, if they believe a door is opened relative to the matters in contention, and of course assuming the proper foundation must be laid at that time." (ECF No. 113, Pls.' Resp. at 1.) Defendant argues that Plaintiffs' offer is a subterfuge because Plaintiffs are reserving the right to unilaterally declare the "door is opened" and "it will be too late for the jury to unhear their theories." (ECF No. 122, Def.'s Reply at 3.) Despite Defendant's arguments, Plaintiffs have made it clear in their briefing and before the Court during the hearing that Plaintiffs would first seek permission from the Court prior to bringing out any of these topics. (ECF No. 122, Def.'s Reply, Ex. A, 12/4/2015 Email re: Motions *in limine*, "...we do not intend to raise those issues, wouldn't for example use in opening, do not expect to use them at all unless the door is opened somehow and then we would let you know in advance.") The Court acknowledges Plaintiffs' counsel's statement and respects that commitment to the Court.

The Court instructs Plaintiffs to give, no less than, two business days advance warning to the Court before bringing up any of the issues in the aforementioned motions *in limine.* Accordingly, at this time, the Court will deny Defendant's remaining eight motions *in limine*.

## IV. CONCLUSION

For all these reasons, the Court will DENY Defendant's Motions *in Limine* ECF Nos. 94, 95, 96, 97, 100, 102, 103, 104 & 105. The Court will also DENY IN PART AND GRANT IN PART Defendant's Motion *in Limine* regarding Non-Party Witnesses such that only evidence regarding Officer Rollo's discipline is precluded as irrelevant (ECF No. 101). Finally, the Court

19

will GRANT Defendant's Motions *in Limine* regarding the descriptive terms "no fly list" and "Retribution Wednesday" (ECF Nos. 98, 99).

        IT IS SO ORDERED.

                              s/Paul D. Borman
                              PAUL D. BORMAN
                              UNITED STATES DISTRICT JUDGE

Dated: September 29, 2016

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2016.

                              s/Deborah Tofil
                              Case Manager